## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Henkel AG & Co. KGaA | ) |
| Plaintiff, | ) |
| -against- | ) C.A. No. 21-0475-LPS |
| GCP Applied Technologies Inc. | ) PUBLIC VERSION<br>) filed April 8, 2021 |
| Defendant. | ) |

## COMPLAINT

Plaintiff Henkel AG & Co. KGaA ("Henkel" or "Plaintiff"), by and through undersigned counsel, as and for its complaint, alleges:

## PARTIES

1. Plaintiff Henkel is a German partnership limited by shares, which is a joint stock company under German law. It has a principal place of business in Dusseldorf, Germany.

2. Defendant GCP Applied Technologies Inc. ("GCP" or "Defendant") is a Delaware corporation with principal place of business in Cambridge, Massachusetts.

## JURISDICTION AND VENUE

3. This Court has diversity subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(a)(2) because these claims arise from a dispute among a citizen of Germany, on the one hand, and a citizen of Delaware and Massachusetts, on the other hand, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

4. This Court has personal jurisdiction over the Defendant because the Defendant is a citizen of Delaware and the claims arise from disputes regarding the Amended and Restated Stock and Asset Purchase Agreement ("Agreement"), dated as of June 30, 2017, by and

between the parties, which is governed by and construed in accordance with the laws of the State of Delaware (attached hereto as **Exhibit 1**).

5. Venue is proper pursuant to the "Governing Law and Jurisdiction" clause in the Agreement that governs disputes between the parties and provides for legal proceedings exclusively in the courts of Delaware. Venue in this Court is proper because the Delaware Court of Chancery does not have subject matter jurisdiction over the claims asserted here.

## NATURE OF THE ACTION

6. Plaintiff and Defendant are parties to the previously noted Agreement dated as of June 30, 2017. The closing date of the Agreement was July 3, 2017 (the "Closing"). As stated in the Agreement, Plaintiff Henkel is the Purchaser and Defendant GCP is the Seller.

7. Pursuant to the Agreement, Henkel acquired various facilities and sites, including in Germany, Japan, Mexico, and France, and acquired all of the shares of GCP Applied Technologies France SAS ("GCP Applied Technologies France").

8. After Closing, Henkel discovered that Defendant had breached certain representations and warranties in the Agreement with respect to five distinct claims related to the aforementioned facilities, sites, and acquisition of GCP Applied Technologies France.

9. Henkel reasonably and justifiably relied upon such representations in entering into the Agreement and, as a result, has suffered an estimated total of approximately USD $16,000,000 in losses related to the five claims, the full amount of which will be proven at trial. Henkel's losses are "Covered Losses" as defined in the Agreement, and therefore, pursuant to the Agreement, Defendant is required to indemnify Henkel for such losses.

10. Henkel followed the required procedures in Section 9.4 of the Agreement to notify Defendant of the Covered Losses and to request indemnification. However, Defendant has refused to indemnify Henkel for the Covered Losses.

11. Henkel therefore demands that Defendant indemnify Henkel pursuant to the Agreement and pay Henkel damages arising from Defendant's breaches of the representations and warranties in the Agreement, in the amount of the Covered Losses, to be proven at trial, minus the USD $5,000,000 deductible in Section 9.2(b)(i) of the Agreement.

## FACTS APPLICABLE TO ALL FIVE CLAIMS

### Agreement: Relevant Representations and Warranties, and Indemnification

12. This dispute arises from Defendant's breaches of the representations and warranties in Sections 3.13 and 3.16 of the Agreement, and its refusal to indemnify Henkel for its Covered Losses as a result of those breaches as required by Article IX of the Agreement.

13. Article III of the Agreement contains Representations and Warranties of the Seller, and Section 3.13 of the Agreement addresses Compliance with Applicable Laws and Permits. Section 3.13 states:

> (a) Since January 1, 2015, none of the Seller Entities, the Target Entities and/or the Business has violated any Law applicable to the conduct of the Business in any material respect.
>
> (b) Since January 1, 2013, none of the Seller Entities, the Target Entities and/or the Business has violated any Sanctions or Anti-Corruption Law or any Antitrust Law applicable to the conduct of the Business in any material respect.
>
> (c) The Seller Entities, the Target Entities and/or the Business hold all Permits necessary for the conduct of the Business as presently conducted in all material respects (the "Business Permits"). The Seller Entities, the Target Entities and the Business are in compliance with the terms of the Business Permits in all material respects.

14. Section 3.16 of the Agreement addresses Labor Relations, Employees and Employee Benefit Plans. Section 3.16(b) states that:

> the Seller Disclosure Schedules sets forth a list of each material Benefit Plan, and separately identifies each material Transferred Benefit Plan. Seller has made available to Purchaser correct and complete copies of each such Transferred Benefit Plan, including all material amendments thereto…

Section 3.16(h) of the Agreement states that:

> the Seller Disclosure Schedules is a true and correct list, as of the date of this Agreement, of each Collective Bargaining Agreement and, to Seller's Knowledge, there are no proceedings of any labor union or works council or other employee representation group to organize or represent any Business Employees.

15. Article IX of the Agreement addresses Indemnification, and Section 9.2 covers Indemnification by Seller, stating that:

> Seller shall indemnify, defend and hold harmless Purchaser and its Affiliates…from and against any and all Covered Losses incurred or suffered by any of the Purchaser Indemnified Parties, to the extent arising out of or resulting from: (i) the failure of any representation or warranty of Seller contained in Article III to be true and correct as of the Closing Date…

16. The Agreement defines "Covered Losses" as "losses, liabilities, claims, fines, deficiencies, damages, payments (including those arising out of any settlement or Judgment relating to any Proceeding), penalties and reasonable attorneys' and accountants' fees and disbursements."

17. As alleged below, GCP, as the Seller in the Agreement, is required to indemnify Henkel for any Covered Losses arising from GCP's breaches of the representations and warranties in Sections 3.13 and 3.16 of the Agreement.

18. In accordance with Section 9.4 of the Agreement laying out procedures related to indemnification, Henkel delivered to GCP written notifications of Henkel's claims

4

giving rise to indemnification on January 18, 2018 (the "Japan Notice"), July 19, 2018 (the "Mexico Notice"), November 13, 2018 (the "France Notice") and January 7, 2019 (the "Norderstedt and Epernon Notice," related to claims in Germany and France) (collectively, the "Indemnification Notices").  The Indemnification Notices identified the breaches of representations and warranties made by GCP under the Agreement.

19. Since sending the Indemnification Notices, Henkel and GCP have exchanged multiple correspondence regarding the indemnification claims, including letters dated: February 18, 2019, March 22, 2019, April 26, 2019, July 19, 2019, November 7, 2019, and December 17, 2019.  In addition, the parties met in Cambridge on November 19, 2019 regarding the claims.

20. After Henkel sent the Indemnification Notices, Henkel and GCP entered into a Tolling Agreement effective as of April 29, 2019 (the "Tolling Agreement") so as to preserve all of their respective legal rights with respect to such claims without allowing any applicable statute of limitations or other potential time bar to expire with respect to such claims for indemnification and without acknowledging in any way that valid claims, causes of action or defenses exist or do not exist for the Tolling Period (as defined in the Tolling Agreement).

21. Subsequently, on April 7, 2020, August 20, 2020, and November 17, 2020, Henkel and GCP amended the Tolling Agreement to modify the Tolling Period and allow Henkel and GCP more time to consider additional information Henkel had provided to GCP and to account for the limitations imposed by the COVID-19 pandemic.

22. On February 19, 2021, Henkel and GCP entered into the Fourth Amended Tolling Agreement, which extended the Tolling Period until the earlier of (a) forty-five (45) days after written notice of termination of the Fourth Amended Agreement and the Tolling Period has

been provided by either Henkel or GCP; or (b) March 31, 2021.  Neither Henkel nor GCP provided written notice of termination, nor did they extend the Tolling Period, so the Tolling Period ends on March 31, 2021.

<b><u>INSUFFICIENT PLANT SAFETY<br>SYSTEMS IN NORDERSTEDT, GERMANY</u></b>

23. Pursuant to the Agreement, Henkel acquired a manufacturing facility in Norderstedt, Germany ("Norderstedt Site").  However, the plant safety systems (in particular, the fire protection and combat systems) at the Norderstedt Site were noncompliant with applicable law at the time of Closing.  Therefore, GCP breached the representations and warranties contained in Section 3.13 of the Agreement.

24. The Norderstedt Site is located in the Federal State of Schleswig-Holstein and is subject to the State Building Ordinance of the Federal State of Schleswig-Holstein (Landesbauordnung für das Land Schleswig-Holstein – "LBO").  According to LBO Sec. 62, para. 1, the construction, operation, or material alteration of buildings and other structures requires a building permit (Baugenehmigung).  In addition, certain parts of the Norderstedt Site, including the Tank Farm (building no. 38, "Tank Farm") are subject to the Federal Immission Control Act (Bundes-Immissionsschutzgesetz – "BImSchG").  The construction, operation, or material alteration of these buildings requires a so-called "BImSchG-permit."

25. The mandatory BImSchG-permit for the construction and operation of the Tank Farm was granted to GCP Darex Germany GmbH ("GCP Germany") on March 20, 2017.  The fire protection concept no. 16002 ("Concept No. 16002"), which was prepared for the Tank Farm by the engineering office SCHÖPE on behalf of GCP Germany is a binding part of the BImSchG-permit.  Therefore, all aspects of the fire protection concept no. 16002 are legally required under the BImSchG-permit.  *See* BImSchG-permit ("[N]ach der Umsetzung der

Nebenbestimmungen … des Brandschutzkonzeptes . . . sind die Genehmigungsvoraussetzungen aus Sicht der Anlagensicherheit gegeben.") ("After implementation of the stipulations of the fire protection concept, the permit requirements are fulfilled from a plant safety perspective.").

26. Additionally, the buildings at the Norderstedt Site qualify as so-called "special buildings" (Sonderbauten) pursuant to Section 51 of the LBO. According to LBO Sec. 70, para. 5, all construction or alteration permits which are granted for special buildings require a fire protection concept that has been reviewed and confirmed by a qualified test engineer for fire protection (Prüfingenieur für Brandschutz). The requirements that are included in these confirmed fire protection concepts become a binding part of the permit that is granted for the special building and must be implemented before the start of the permitted operations.

27. Therefore, all requirements which are included in Concept No. 16002 were legally binding material requirements at the date of Closing.

28. Furthermore, mezzanine platforms for the storage tanks in buildings 25 and 35 were constructed by GCP already around 1998. The installation of the mezzanine steel platforms at the Norderstedt Site was a material alteration of the existing buildings that required a building permit. However, the mezzanine platforms were constructed by GCP without the required permits, and the tank platforms' construction did not comply with the applicable standards and requirements. Accordingly, noncompliance issues arising from that construction existed long before Closing.

29. GCP Germany was aware of the building permit requirement and applied for such permit on December 7, 2016. As stated in a December 20, 2016 letter to GCP Germany, construction of the mezzanine platforms was prohibited until a permit was issued. ("Abschließend weise ich Sie darauf hin, dass sie mit den Bauarbeiten bzw. der Nutzung nicht vor Zugang der

schriftlichen Baugenehmigung beginnen dürfen") ("Finally, I would like to point out that you are not allowed to commence construction works or operations prior to the receipt of the written building permit.")  GCP Germany had installed the platforms without the required permit, in direct violation of the LBO.

30. The facilities of the Norderstedt Site are qualified as so-called "special buildings" (Sonderbauten) such that all permits which are granted for the construction or alteration of buildings incorporate a binding fire protection concept.  LBO Section 70, paragraph 5.  The required fire protection concept no. 16001 ("Concept No. 16001") for construction of the mezzanine was prepared by the engineering office SCHÖPE on behalf of GCP Germany.  German authorities forwarded Concept No. 16001 to a qualified test engineer via letter dated March 13, 2017 for review and confirmation as required under LBO Sec. 70, para. 5.  However, the engineer found that Concept No. 16001 was insufficient.  SCHÖPE revised Concept No. 16001 on behalf of GCP Germany and issued Concept No. 16001Ü1.  The engineer once again found the concept to be deficient.

31. At the time of Closing, there was no valid fire protection concept for the mezzanine platforms, and special permits were therefore still outstanding.  Henkel has now retained a consultant to finalize the fire protection concept and secure the necessary permits as required and has commenced work and incurred substantial amounts to address the facilities non-compliance.

32. All aspects of Concept Nos. 16001, 16001Ü1, and 16002 were legally binding upon GCP Germany at the date of Closing under the existing BImSchG-permit and they still needed to secure the outstanding building permit for the mezzanine platforms.

33. The total estimated cost to bring the Norderstedt Site into compliance is approximately **USD $10,000,000**, with the exact amount to be proven at trial. Therefore, Henkel seeks indemnification from GCP pursuant to the Agreement to cover these losses and any related Covered Losses, including but not limited to its reasonable attorneys' and consultants' fees and expenses, due to GCP's breach of the representations and warranties in Section 3.13 of the Agreement.

## MISSING BUILDING PERMITS IN JAPAN

34. Pursuant to the Agreement, a subsidiary of Henkel acquired a portion of a manufacturing site in Atsugi, Japan ("Japan Site"). However, prior to Closing, GCP made certain modifications to the buildings and facilities at the Japan Site without obtaining mandatory legal building permits and certificates. As a result, at the time of Closing, certain buildings were noncompliant with applicable law. Therefore, GCP breached the representations and warranties in Section 3.13 of the Agreement.

35. Specifically, at least fifty-seven (57) structures at the Japan Site are missing "Confirmation Certificates" (検査済証) that are required for all buildings greater than ten square meters pursuant to Article 6, Clause 1, Item 4 of the Building Standards Act of Japan （建築基準法, "BSA"） that applies to the Japan Site classified as a City Planning Area (都市計画地域). Buildings that lack Confirmation Certificates are subject to shutdown or deconstruction under Article 9 of the BSA, regardless of whether construction or modification is sought.

36. In order to bring the buildings at the Japan Site into compliance in lieu of valid Confirmation Certificates, Henkel is required to undergo the process described in the "Guideline to Confirm Compliance with the Building Standards Act of Buildings Without Inspection Certificates by Use of Designated Inspection Confirmation Organization" (検査済証

9

のない建築物に係る指定確認検査機関を活用した建築基準法適合調査のためのガイドライン). The process involves an inspection by a "Designated Inspection Confirmation Organization" ("DICO") and implementation of the corrective actions identified by the DICO.

37. Henkel has already retained the services of a DICO, and twenty-three (23) corrective actions must be implemented. Eighteen (18) of the twenty-three actions are on Henkel's side of the site, and Henkel is responsible for such actions. The other five (5) corrective actions are on the GCP side of the site, and GCP is responsible for those corrective actions. However, the site is considered one site, so Henkel cannot engage in construction, even on the Henkel side of the site, until all twenty-three corrective actions are implemented so that the Japan Site is in compliance with the BSA and relevant ordinance.

38. The total estimated cost of bringing the Japan Site into compliance is around **USD $1,000,000**, with the exact amount to be proven at trial. Therefore, Henkel seeks indemnification from GCP pursuant to the Agreement to cover these losses and any related Covered Losses, including but not limited to its reasonable attorneys' and consultants' fees and expenses, due to GCP's breach of the representations and warranties in Section 3.13 of the Agreement.

**INSUFFICIENT FIRE DETECTION AND COMBAT SYSTEMS IN MEXICO**

39. Pursuant to the Agreement, wholly-owned subsidiaries of Henkel acquired a manufacturing facility in Santiago Tianguistenco, Mexico ("Mexico Site"). However, certain aspects of the fire protection concept at the Mexico Site were noncompliant with applicable law at the time of Closing. Therefore, GCP breached the representations and warranties in Section 3.13 of the Agreement.

40. Specifically, Standard Mexican Regulation (Norma Oficial Mexicana) NOM-002-STPS-2010 ("NOM-002") provides a number of requirements for "High Fire Risk" locations. The Mexico Site produces and distributes chemical compounds in the form of lacquers, plastics and polymers, including highly ignitable liquids, and is classified as a "High Fire Risk" location subject to the requirements of NOM-002.

41. Henkel has identified four specific aspects of the fire combat system at the Mexico Site that are noncompliant with NOM-002: (1) the smoke alarm and fire detection system; (2) the water storage tank; (3) the piping loop; and (4) the fire pumping system. With respect to the smoke and fire detection system, eleven (11) manual alarm stations are not connected to the central control panel as required under NOM-002. Moreover, the system for detecting smoke in the warehouse areas has been disabled since at least 2017.

42. In a July 19, 2019 letter from GCP to Henkel, GCP conceded that "a fire alarm system, to the extent not in place at Closing, was required by NOM-002, if the Santiago Site was appropriately classified as High Risk at that time." However, GCP reserved its right to dispute that the facility was a "High Fire Risk" location at the Closing date.

43. With respect to the water storage tank, NOM002 requires onsite water storage capacity sufficient to supply two hours of continuous water in the event of a fire. The current 29,000 gallon water storage tank is insufficient for this purpose, and needs to be expanded or replaced with a 265,000 gallon tank to comply with NOM-002. With respect to the fire pumping system, the Mexico Site does not have a secondary, backup fire pump system as required under NOM-002.

44. Henkel personnel and counsel identified the compliance deficiencies at the Mexico Site through independent legal analysis.

45. The estimated cost associated with bringing the Mexico Site into compliance is over **USD $1,900,000**, with the exact amount to be proven at trial. Therefore, Henkel seeks indemnification from GCP pursuant to the Agreement to cover these losses and any related Covered Losses, including but not limited to its reasonable attorneys' and consultants' fees and expenses, due to GCP's breach of the representations and warranties in Section 3.13 of the Agreement.

## INSUFFICIENT FIRE DETECTION AND COMBAT SYSTEMS IN EPERNON, FRANCE

46. Pursuant to the Agreement, Henkel acquired a manufacturing facility in Epernon, France ("Epernon Site"). However, the Epernon Site was noncompliant with applicable law at the time of Closing. Therefore, GCP breached the representations and warranties in Section 3.13 of the Agreement.

47. On May 27, 2013, local French authorities requested an updated operating permit application from the former occupant of the facility and legal predecessor to GCP Applied Technologies France, W.R. Grace, in light of new local legislation. W.R. Grace conducted a review of the facility and prepared a compliance report, which French authorities reviewed. On January 28, 2019, the French authorities issued an updated operating permit that required a firewall extension at the facility.

48. The effective notice of noncompliance in January 2019 resulted from conditions that were present at the Epernon Site since 2013. In other words, the Site was noncompliant with applicable law at that time (well before the time of Closing). GCP's failure to disclose the same violated the terms of the Agreement.

49. The estimated cost associated with bringing the Epernon Site into compliance is over **USD $300,000**, with the exact amount to be proven at trial. Therefore, Henkel

seeks indemnification from GCP pursuant to the Agreement to cover these losses and any related Covered Losses, including but not limited to its reasonable attorneys' and consultants' fees and expenses, due to GCP's breach of the representations and warranties in Section 3.13 of the Agreement.

### UNDISCLOSED PENSION LIABILITIES IN FRANCE

50. Pursuant to the Agreement, Henkel acquired all of the shares of GCP Applied Technologies France from GCP Construction Products Holdings (UK) Limited, a wholly-owned subsidiary of GCP. As of the Closing date, seventy-seven (77) employees of the former GCP Applied Technologies France were eligible for pension payments under the collective bargaining agreement applicable to the rubber industry in France (the "Rubber Industry CBA"). However, GCP did not adequately disclose the Rubber Industry CBA or the pension payments owed to these 77 employees in the Seller Disclosure Schedules. Therefore, GCP breached the representations and warranties in Section 3.16 of the Agreement.

51. Pursuant to Section 3.16(h) of the Agreement, Section 3.16(h) of the Seller Disclosure Schedules called for a true and correct list of collective bargaining agreements to which GCP was subject. GCP did not disclose the Rubber Industry CBA in that section as required. Furthermore, pursuant to Section 3.16(b) of the Agreement, Section 3.16(b) of the Seller Disclosure Schedules called for a true and correct copy of each transferred benefit plan.

52. The costs and expenses related to the pension payments owed to the 77 employees pursuant to the undisclosed Rubber Industry CBA is in excess of over **USD $2,700,000**, with the exact amount to be proven at trial. Therefore, Henkel seeks indemnification from GCP pursuant to the Agreement to cover these losses and any related Covered Losses, including but not

limited to its reasonable attorneys' and consultants' fees and expenses, due to GCP's breach of the representations and warranties in Section 3.16 of the Agreement.

## COUNT I:  Breach of Contract

53. Henkel realleges the allegations set forth in paragraphs 1 through 52 as if fully set forth herein.

54. Plaintiff Henkel is a counterparty, signatory, and real party in interest to the Agreement, dated as of June 30, 2017, described above, that was entered into by and between Henkel and GCP.

55. Defendant GCP is a counterparty, signatory, and real party in interest to the Agreement.

56. Henkel performed all of the obligations required of it under the Agreement.

57. Defendant failed to perform and breached the representations and warranties in Sections 3.13 and 3.16 of the Agreement as alleged herein.

58. Henkel suffered approximately USD $16,000,000 in damages, with the exact amount to be proven at trial, as a direct and proximate result of Defendant's breaches of the representations and warranties in the Agreement.

59. Henkel's Covered Losses (as defined in the Agreement) also include all fees incurred in connection with this action.

60. Defendant is required to indemnify Plaintiff pursuant to Section 9.2 of the Agreement.  The losses Henkel claims are Covered Losses as defined in the Agreement, Henkel complied with the requirements of Section 9.4 of the Agreement by providing Defendant with the Indemnification Notices, and the parties tolled the applicable statute of limitations until March 31, 2021 pursuant to the Tolling Agreement and subsequent amendments.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Henkel respectfully requests judgment in its favor and against Defendant as follows:

a)  An order that GCP indemnify Henkel pursuant to the Agreement and pay Henkel damages arising from breaches of representations and warranties to make up for Henkel's Covered Losses, minus the USD $5,000,000 deductible in Section 9.2(b)(i) of the Agreement.

b)  Henkel's fees and costs, including attorneys' fees, incurred in connection with this action.

c)  Such further and other relief as the Court may deem to be just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Matthew W. Walch
Katrina L. Robinson
Julia S. Waterhous
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
matthew.walch@lw.com
katrina.robinson@lw.com
julia.waterhous@lw.com

March 30, 2021

/s/ Kevin M. Coen
Kevin M. Coen (#4775)
Alexandra M. Cumings (#6146)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
kcoen@morrisnichols.com
acumings@morrisnichols.com
  *Attorneys for Henkel AG & Co. KGaA*